David C. Barrett Jr.*
Jeffrey A. Easterday
Russell N. Cunningham**
Carolyn Eselgroth
Troy A. Callicoat

**BARRETT,
EASTERDAY,
CUNNINGHAM
&
ESELGROTH
LLP**

7269 Sawmill Rd.
Dublin, Ohio 43016
614.210-1840
Fax 614.210-1841

Francis X. Fullin,
*Of Counsel*

**COUNSELORS
&
ATTORNEYS-AT-LAW**

Direct Dial: 614.210-1842
dbarrett@ohiocounsel.com
dbarrett@farmlawyers.com

*Also admitted in District of Columbia
**OSBA Certified Specialist in Estate
Planning, Trust and Probate Law

November 10, 2010

<u>**Sent Via FedEx**</u>

Patricia B. Fugee, Esq.
Henry J. Geha III, Esq.
ROETZEL & ANDRESS
One SeaGate
Suite 1700
Toledo, OH 43604

Re: **Notice to SunTrust Bank** -- *Paladin Homeland Security Holdings LLC v. FGDI, a division of Agrex Inc.*, Case No. 10-cv-02285, U.S. District Court for the Northern District of Ohio (Toledo)

Dear Patricia & Henry:

This is to follow up my telephone conversation of November 4, 2010, with Henry Geha and my email correspondence of the same date to Mr. Geha. It is my understanding that your firm represents SunTrust Bank in the GOE Lima LLC bankruptcy case, Case No. 08-35508, which remains pending in the U.S. Bankruptcy Court in Toledo.

As I indicated in my telephone conversation with Henry Geha, our firm represents FGDI, a division of Agrex Inc. Our client has been named as the defendant in the above referenced lawsuit filed by Paladin Homeland Security Holdings LLC. A copy of the complaint is enclosed. The current deadline is December 6, 2010, for filing a responsive pleading to the complaint.

In our investigation of the allegations set forth in the Paladin complaint, it has come to our intention that FGDI entered into the enclosed **Agreement for Assignment of Claims and Proceeds Under Letter of Credit** (the "Agreement") with SunTrust Bank and other parties. SunTrust Bank is designated the Assignee in the Agreement. Section 6 of the Agreement contains an indemnification clause that also provides for notification of the Assignee (*i.e.*, SunTrust Bank) in the event suit is filed by Paladin against our client.

November 10, 2010                                                                                          2

Please consider this communication our client's demand for indemnification pursuant to the Agreement.  Also, please confirm that your client intends to take over the defense of the lawsuit and let us know what further information your client may need with respect to the claims asserted in the complaint.

Sincerely,

BARRETT, EASTERDAY,
CUNNINGHAM & ESELGROTH LLP

David C. Barrett, Jr.

Enclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PALADIN HOMELAND SECURITY HOLDINGS, LLC<br>2001 Pennsylvania Avenue, N.W. Suite 400<br>Washington, D.C. 20006 | Case No.<br><br>Judge |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DAMAGES** |
| | **(JURY DEMAND ENDORSED HEREON)** |
| FGDI, LLC<br>A Division of Agrex, Inc.<br>10975 Grandview Drive, Suite 200<br>Overland Park, KS 66210 | |
| Defendant. | |

## Introduction

1.     This is an action seeking damages caused by Defendant's breach of contract, fraudulent statements and negligent misrepresentations relating to Defendant obtaining payment under an Irrevocable Standby Letter of Credit ("LC"), put in place by Plaintiff Paladin Homeland Security Holdings, LLC ("Paladin"), a LC which was to have been drawn against only in the event that GOE Lima, LLC ("GOE") was in default of its payment obligations under a Grain Origination Agreement, dated July 29, 2008 to Defendant FGDI, LLC ("FGDI"), a division of Agrex, Inc.

2.     FGDI and GOE were parties to the Grain Origination Agreement ("Grain Agreement") pursuant to which FGDI agreed to deliver requisite quantities and quality of corn to GOE 's ethanol facility located in Lima, Ohio.

3.     Paladin and GOE were parties to a series of written agreements entitled Memorandum of Understanding and Agreement ("MOU") the last of which was dated July 28,

2008 and pursuant to which Paladin agreed to provide a LC in favor of FGDI, provided FGDI agreed to supply corn to GOE on terms no less favorable to GOE than the terms set out in the Grain Agreement.

4.      FGDI's wrongful conduct complained of herein – i.e., falsely representing to Silicon Valley Bank that GOE was in default of its payment obligations under the Grain Agreement and that FGDI was therefore entitled to draw down against the LC -- has damaged Paladin in an amount in excess of $1,370,140.00.

### Parties

5.      Paladin is a Delaware limited liability company with its principal place of business located in Wilmington, Delaware.  Paladin is an investment advisor to and general partner of private equity funds.

6.      FGDI, as a result of a merger effective July 1, 2010, is a division of Agrex, Inc. ("Agrex").  Agrex is a Kansas corporation with its principal place of business located in Overland Park, Kansas.  FGDI is engaged in providing a wide range of agriculture commodities to world markets, including the purchase and sale of corn into commercial channels.

7.      GOE is a Delaware limited liability company.  At all times relevant to this action, GOE maintained its principal place of business as 2485 Houx Parkway, Lima, Ohio, 45804, at which GOE has produced several products, including ethanol, using corn as its feedstock.

### Jurisdiction and Venue

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332.  The matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the matter is between citizens of different states, such that there is complete diversity of citizenship among the parties.

9.      Venue of this action is proper in this Court pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

## Facts

10.     In or about July of 2008, FGDI represented to GOE that it could originate and deliver to GOE the quantity and quality of corn required by GOE for its operations at its Lima facility.  To memorialize their agreement, FGDI and GOE entered into the Grain Agreement, a copy of which is attached hereto as Exhibit A.

11.     Pursuant to Paragraph 4(c) of the Grain Agreement, payment from GOE to FGDI for grain delivered to GOE's Lima facility was due not later than the Tuesday immediately following the week in which the corn was delivered.  However, provided GOE was not otherwise in default under the Grain Agreement, GOE could defer payment to FGDI per the Grain Agreement for one (1) additional week (defined as the "Alternative Payment Date").

12.     During the term of the Grain Agreement, GOE was required to provide and maintain a $2 million LC in favor of FGDI which would permit FGDI to draw down against the LC in the event of default or non-payment by GOE.

13.     FGDI knew that GOE lacked sufficient financial resources on its own to obtain the LC, but learned of and understood that GOE could do so were it to rely upon and obtain the financial backing of Paladin.

14.     In accordance with the MOUs, Paladin accepted certain financial responsibility to support the development of GOE's business at the Lima facility.  The last of these agreements was the July 28, 2008 MOU, pursuant to which Paladin agreed to provide the security (in the form of a LC) required by FGDI, the "Corn Supplier" under the Grain Agreement, in order for it to continue to make corn deliveries to GOE.

15.     The MOU and the Grain Agreement were interrelated as they were intended to and in fact operated as a unified commercial financial accommodation providing security to FGDI for GOE's payment for corn delivered under the Grain Agreement.  FGDI knew that Paladin had agreed to provide the LC.  Upon information and belief, but for Paladin's agreement to provide security on GOE's behalf, FGDI would not have entered into the Grain Agreement.

16.     On July 29, 2008, Paladin applied for and obtained the LC from Silicon Valley Bank ("SVB"), pursuant to which FGDI was the "Beneficiary."  A copy of the LC is attached hereto as Exhibit B.

17.     As a requirement for SVB's issuance of the LC, Paladin agreed to reimburse SVB in full for any draws made by FGDI on the LC and for any bank charges incurred as a result.

18.     Pursuant to Paragraph 15(c) of the Grain Agreement, an "event of default' occurred if GOE failed to make any payment due on or before the Alternative Payment Date and if such default was not cured by GOE within one (1) business day of the occurrence of such default.  Only under such circumstances did FGDI have the right to draw down on the LC, and then, only in the amount of the default.

19.     FGDI knew, or should have known, that Paladin would not have applied for and obtained the LC but for the Grain Agreement between FGDI and GOE.  Paladin was aware of and expressly relied upon the representations and agreements in the Grain Agreement before obtaining the LC for the benefit of FGDI.  But for Paladin's agreement to provide the LC, FGDI would not have extended credit to GOE for deliveries of corn.

20.     On October 14, 2008 ("Petition Date"), GOE filed a voluntary proceeding seeking relief under chapter 11 of Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Ohio at Toledo, Case No: 08-35508-maw ("Bankruptcy Case").

Case: 3:10-cv-02285-JZ  Doc #: 1  Filed:  10/07/10  5 of 9.  PageID #: 5

21.     In the Bankruptcy Case, GOE sought an order authorizing it to pay claims of FGDI and other corn suppliers for sums due **prior** to the Petition Date.  The Court entered an Order on October 17, 2008, authorizing GOE to pay certain corn suppliers, including FGDI.  As the condition for such payment, FGDI and other corn suppliers were required to continue to extend credit to GOE on the same terms that were in effect **prior** to the Petition Date.

22.     After the Petition Date, GOE made certain cash prepayments to FGDI for the purpose of satisfying its payment obligations under the Grain Agreement.  Specifically, GOE made three (3) prepayments to FGDI, the first in the amount of $200,000.00, on October 17, 2008; the second for $200,000.00 on October 20, 2008; and the third for $200,000.00 on October 22, 2008 (the "October prepayments").

23.     GOE also executed and delivered to FGDI a series of six Priced Purchase Contracts and Confirmations ("Contracts") numbered-- 1105, 1106, 1107, 1109, 1111, and 1112, respectively.  GOE specifically directed, and upon information and belief FGDI agreed and/or acquiesced, to apply the October prepayments towards payment for the corn purchased under these Contracts.

24.     Between October 29, 2008 and November 4, 2008, GOE executed and delivered to FGDI another series of Priced Purchase Contracts.

25.     GOE wired to FGDI, as additional prepayments, $450,000.00 on October 31, 2008, and $150,000.00 on November 4, 2008 (collectively referred to, together with the October prepayments, as "the prepayments").  GOE directed FGDI to apply these two (2) prepayments towards the purchases of corn delivered to GOE on and after October 29, 2008.

### First Claim for Relief
### (Breach of Contract)

26.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations contained in Paragraphs 1 through 25 of this Complaint.

27.     GOE complied with and performed its obligations under the Grain Agreement as of November 4, 2008, by tendering in sufficient amount the prepayments for the Contracts numbered 1105 to 1117, inclusive (excluding 1108 and 1110).

28.     Upon information and belief FGDI, without legal justification or other proper reason, did not apply GOE's prepayments as GOE had directed.

29.     Instead of applying GOE's prepayments to the Contracts, FGDI returned $800,000.00 of prepayments to GOE on October 30, 2008, thereby creating the appearance that GOE was in default of its payment obligations under the Grain Agreement.

30.     On the basis of this manufactured "event of default" after October 30, 2008, FGDI submitted three (3) draws against the LC  and received payment of $1,367,140.00 from SVB under the LC ( "Draws ## 3-5") between November 7, 2008 and November 21, 2008.

31.     Upon information and belief GOE had timely prepaid, as of November 4, 2008, the invoices GOE received from FGDI for Draws ## 3-5, as evidenced by the prepayments tendered by GOE.

32.     As a consequence of the draws made by FGDI against the LC to pay itself for Draws ## 3-5, Paladin was required to and has in fact repaid SVB in the full amount of the draws against the LC, together with $3,582.85 in bank charges.

33.     FGDI's wrongful draws against the LC, when GOE was not in default, constitute a breach of the Grain Agreement, as a direct and proximate result of which Paladin has been damaged in the amount it has paid over to SVB for the monies FGDI wrongfully drew down under the LC.

### Second Claim for Relief
### (False Statements)

34.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations contained in Paragraphs 1 through 33 of this Complaint.

35.     To obtain payment under the LC, an authorized officer of FGDI was required to certify to SVB that the conditions set forth in Section 15(c) of the Grain Agreement had in fact occurred; that GOE was in default of its payment obligations; and, that the grace period had expired.  FGDI was also required to provide a copy to SVB of each unpaid invoice to support each draw request FGDI made against the LC.

36.     In making each of the Draws ## 3-5 against the LC, FGDI knowingly made false representations that GOE was in default of its payment obligations under the Grain Agreement. FGDI made these false representations for the purpose of inducing SVB to make payments to FGDI under the LC.

37.     FGDI knew at the time it made such representations to SVB that its representations were untrue.

38.     Upon information and belief, in making payments to FGDI under the LC, SVB relied upon the representations and certifications made to it by FGDI that GOE was in default in making payment to FGDI under Grain Agreement, in the aggregate amount of $1,367,140.00, under Draws ## 3-5.

39.     As a direct and proximate result of FGDI's false representations to SVB, Paladin has been damaged in the amount it has repaid SVB for those monies drawn down by FGDI under the LC, and for the additional bank charges levied by SVB.

### Third Claim for Relief
### (Negligent Misrepresentation)

40.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations contained in Paragraphs 1 through 39 of this Complaint.

41.     FGDI, in the course of its business, owed duties to Paladin to use reasonable care and competence in obtaining or communicating information to SVB relative to the timeliness and amount of GOE's payments to FGDI under the Grain Agreement.

42.     FGDI breached its duties to Paladin by falsely representing to SVB that GOE was in default of its payment obligations under the Grain Agreement; and, that the grace period had expired.

43.     Upon information and belief, SVB justifiably relied upon FGDI's representations concerning GOE's alleged defaults under the Grain Agreement.

44.     As a direct and proximate result of FGDI's failure to act with reasonable care and competence in obtaining or communicating these purported events of default to SVB, Paladin has been damaged in an amount in excess of $1,370,140.00.

WHEREFORE, Plaintiff Paladin Homeland Security Holdings, LLC demands judgment against the Defendant as follows:

(A)     An award of compensatory damages in an amount in excess of $1,370,140.00 on each of the First, Second and Third Claims for Relief, together with interest allowable by law;

(B)     An award of punitive damages on the Second Claim for Relief, in an amount to be determined at trial;

(C)     An award to Plaintiff of its costs, fees and expenses incurred herein;

(D)     Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

/s/ Roger P. Sugarman
Roger P. Sugarman    (0012007)
Katherine C. Ferguson    (0079207)
KEGLER, BROWN, HILL & RITTER
A LEGAL PROFESSIONAL ASSOCIATION
65 East State Street, Suite 1800
Columbus, OH 43215-4294
Telephone: (614) 462-5400
Facsimile:  (614) 464-2634
Email: rsugarman@keglerbrown.com
Email: kferguson@keglerbrown.com

*Attorneys for Plaintiff*
*Paladin Homeland Security Holdings, LLC*

**JURY DEMAND**

Plaintiff Paladin Homeland Security Holdings, LLC hereby demands a trial by jury as to all issues so triable.

/s/ Roger P. Sugarman
One of the Attorneys for Plaintiff

# EXHIBIT A

## GRAIN ORIGINATION AGREEMENT

THIS GRAIN ORIGINATION AGREEMENT (the "Agreement"), is made and entered into this 29th day of July, 2008, by and among GOE-Lima, LLC ("Client"), an Ohio limited liability company with its principal office located at Lima, Ohio, and FGDI, L.L.C. ("FGDI"), a Delaware limited liability company having its principal office located at 19901 North Dixie Highway, Suite B, Bowling Green, Ohio 43402.

WHEREAS, Client has developed an ethanol production facility located at Lima, Ohio (the "Plant") that will produce several products, including ethanol, using corn as its feedstock;

WHEREAS, FGDI is in the business of purchasing and selling corn into commercial channels and can originate the quantity and quality of corn required by Client for delivery to the Plant.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.  **Scope of Services.** FGDI shall provide grain origination services related services as described in Exhibit A and incorporated herein, under terms and conditions as hereinafter further provided.

2.  **Corn Origination by FGDI.** FGDI agrees to supply to Client and deliver to the Plant one half of the corn required for it to maintain the normal production schedule of the Plant, unless prevented from doing so by circumstances of supply or logistics reasonably beyond its control. Client will maintain a standby letter of credit in the sum of $2,000,000. The initial standby letter of credit will be for a six month term through January 31, 2009, after which Client may be required to post another standby letter of credit or other security acceptable to FGDI. In the event of default FGDI will have the immediate right to draw payment on the letter of credit. FGDI shall work to seek to obtain the lowest possible total corn cost for Client under prevailing market conditions consistent with prudent risk management practices. Client shall purchase from FGDI, and FGDI shall supply to Client, minimum one half of the corn required for the operation of the Plant during the term hereof. Such origination shall be on the terms herein provided. Except as provided to the contrary in any cash forward contract or for sales out of FGDI's inventory in storage as herein provided, and unless otherwise agreed by the parties in writing or by oral agreement confirmed in writing, corn shall be sold by FGDI to Client, delivered at the Plant, at a price per bushel that shall be equal to FGDI's actual cost of origination and delivery, plus the FGDI Service Fee set forth in Section 3 FGDI's actual cost shall be the amount actually paid by FGDI to its supplier for the corn plus (1) actual freight, demurrage and other transportation costs incurred by FGDI, (2) corn taxes, excise, or other transaction taxes, if any, imposed on the acquisition or sale of the corn, and (3) any other direct cost actually incurred by FGDI and paid in obtaining and delivering the corn. Client shall separately pay all rail car lease expenses, and such expenses shall not be included in item (1) above to the extent paid by Client.

1

3.   <u>Fees.</u>

Client shall pay FGDI an origination fee pursuant to the following schedule: farmer delivery .5 cent per bushel; grain elevator delivery 4 cents per bushel; unit train delivery 3 cents per bushel; for services hereunder on each bushel of corn delivered to the plant for the first year after the Effective Date as defined in Section 15(a) ("**Regular Service Fee**"). This fee is also referred to herein as the "**FGDI Service Fee**". Client will pay FGDI a minimum annual service fee adjustment (the "**FGDI Minimum Annual Fee Adjustment**"), if Client purchases less than the minimum amount, which minimum purchase amount is agreed to be 9.1 million bushels per calendar year, prorated for partial years, (the "**Minimum Purchase Amount**"), during any year of the term hereof after the Effective Date. The amount of the FGDI Minimum Annual Fee Adjustment shall be the difference between the actual bushels purchased and Minimum Purchase Amount multiplied by 4 cents per bushel. FGDI shall compute and invoice Client for any FGDI Minimum Annual Fee Adjustment that may become due after the end of each year of the term. The FGDI Service Fee shall be in addition to the delivered price of corn sold by FGDI to Client as provided for herein. Payment of such fee shall be made with the payment for each bushel delivered hereunder, or in the case of any Minimum Annual Fee Adjustment, shall be paid within ten days of FGDI's submission of an invoice for such fee.

4.   <u>Corn Origination Terms.</u>   Corn origination by FGDI shall be provided in accordance with Exhibit A and the following terms:

(a)   <u>Pricing.</u> Open cash forward contracts shall initially be established as basis contracts and shall be priced by exchange of futures not more than thirty days prior to delivery.

(b)   <u>Confirmations.</u>  All cash deliveries and cash forward contracts shall be confirmed by FGDI in writing on or before the date of delivery with a copy of the confirmation to the Client Representative. All transactions so confirmed shall be deemed to incorporate all of the provisions of this Agreement therein.

(c)   <u>Payment.</u> Payment in full for all corn delivered, including the FGDI Service Fee specified in Section 3, shall be made by wire transfer to FGDI's bank account or, if elected by Client, by automated debit on Client's bank account. Each such transfer or debit shall be completed not later than: (i) on the Tuesday immediately following the week in which FGDI delivered the corn (which is defined as "Standard Payment Corn"), which shall be defined as "**Standard Payment Date**" or (ii) provided Client is not in default, Client may elect the extension of payment

2

to the subsequent Tuesday following the Tuesday defined in 4.c(i) which shall be defined as **"Alternative Payment Date"**, and such corn shall be defined as **"Alternative Payment Corn"**. If Client elects **"Alternative Payment Date"**, in addition to other fees and charges as described in section 3 client shall pay FGDI interest on the amount of the shipments made on **"Alternative Payment Date"** at the rate of New York Prime plus 1%.

(d)  **Source.**  FGDI may make deliveries out of its corn inventory in storage or cause producers or other sellers to make direct delivery to the Plant.  In either case, FGDI shall be deemed the seller and Client shall be deemed the buyer of the corn, per the contracts established as provided herein.  If corn is supplied out of FGDI's inventory in storage (excluding any grain stored at Client's facility as described in section 4(e)(2) below), the parties shall establish the price by written contract or by oral agreement, confirmed in writing, on a case by case basis in lieu of the price otherwise specified in Section 2, with the intent of providing fair compensation to FGDI under prevailing market conditions for the risk and cost of carry of such inventory.

(e)  **Other Terms of Sale.**

  (1)  All deliveries hereunder shall be to the Plant, unless otherwise mutually agreed.

  (2)  FGDI may store up to 500,000 bushels of grain at Client's facility.  Title shall pass to Client, subject to the security interest provided herein, upon Client's usage of the grain for the production of ethanol.  Client shall provide FGDI with regular reports of its usage of FGDI's grain.  FGDI shall have the right to periodically physically measure, inspect and sample grain that it stores in Client's facility.

  (3)  All corn shall be priced and sold based on No. 2 yellow corn grade and quality, with discounts from such grade and quality to be in accordance with the regular schedule of discounts as established by FGDI and Client jointly in the ordinary course of business.  The quality of corn delivered under this Agreement for truck deliveries shall be determined at the place and time of delivery at the Plant. The quality of corn delivered under this Agreement for rail deliveries shall be determined at the point of loading on board the rail car.  The weight of corn delivered by FGDI to Client shall be established by weight certificates.  Client shall obtain truck weights on the scales at the Plant, and rail weights will be obtained on any origin certified scales. Client reserves the right to establish reasonable minimum standards respecting minimum grade and quality and to notify FGDI of such standards, from time to time.  All deliveries shall be at least of the grade and quality so specified.   Client reserves the right to reject individual shipments not complying with this provision.

3

(4)    FGDI shall sell corn to Client free and clear of all liens and security interests, except FGDI's lien for payment provided herein.

(5)    Acceptance of deliveries not meeting the minimum grade and quality and other standards set by Client shall be at the option of the Client. If the Client elects to accept such deliveries not meeting specified grade and quality, Client's scale of discounts and premiums at time of delivery will apply on a per load basis.

(f)    **Security.** FGDI shall retain a purchase money security interest in, and to, all corn delivered to, or held by Client which shall secure payment in full of all sums due to FGDI from Client hereunder at any time, including, but not limited to, the purchase price for corn delivered and all fees and charges specified herein. Such security interests shall be perfected by FGDI filing of appropriate UCC-1 financing statements. As additional security the Client will provide and maintain during the term hereof a standby letter of credit to FGDI from a bank acceptable to FGDI in the amount of $2,000,000.00. The initial standby letter of credit will be for a six month term through January 31, 2009, after which Client may be required to post another standby letter of credit or other security acceptable to FGDI. Such letter of credit shall be irrevocable, shall be in form acceptable to FGDI, and shall permit FGDI to draw thereon for any event of default or non payment including (i) payment for corn delivered or shipped to Plant that is due under the terms of this Agreement; (ii) any other sum that is due to FGDI under this Agreement; or (iii) any other sum that is due to FGDI under any contract pursuant to this Agreement. FGDI shall have the right to suspend deliveries for any period when such letter of credit shall not be in force.

(g)    **Corn Warranties.** FGDI understands that Client intends to use the corn purchased from FGDI as primary base stock for the production of ethanol and other products, and that such corn is subject to minimum quality standards for such use. Accordingly, FGDI warrants and agrees that:

(1)    Corn delivered to Client shall not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (the "Act"), and that such corn may lawfully be introduced into interstate commerce pursuant to the provisions of the Act. The corn also shall comply fully with any applicable state and local laws or regulations governing quality, naming and labeling of corn;

(2)    Corn delivered to Client shall be free and clear of liens and encumbrances, except for liens granted herein;

(3)    All corn delivered to the Plant shall be acceptable in the feed trade under current industry standards and shall be of merchantable quality;

4

(4)    Corn that is deemed to be of non-merchantable quality shall not be delivered to the Plant; and

(5)    All corn contracts and deliveries negotiated by FGDI for Client shall contain provisions consistent with the foregoing requirements.

5.    __Authorized Representatives.__

(a)    Client shall designate one or more representatives in writing by execution and delivery of a designation in the form of Exhibit B-1 attached hereto who shall be authorized and directed to make purchasing, delivery, and risk management decisions for Client (the "**Client Representatives**"). All directions, transactions and authorizations given by such representative to FGDI shall be binding upon Client. FGDI shall be entitled to rely on the authorization of such persons until it receives written notification from Client that such authorization has been revoked.

(b)    FGDI shall designate one or more representatives in writing by execution and delivery of a designation in the form of Exhibit B-2 attached hereto who shall be authorized and directed to make decisions under this Agreement for FGDI (the "**FGDI Representatives**"). All directions, transactions and authorizations given by such representative to Client shall be binding upon FGDI. Client shall be entitled to rely on the authorization of such persons until it receives written notification from FGDI that such authorization has been revoked.

6.    __Allocation of Responsibilities.__

(a)    At Client's request, and with Client's cooperation FGDI shall in good faith work to administer a program whereby Client's need for corn as an input to the Plant are sufficiently satisfied and the risks thereof, together with commodity price risks for Plant outputs, are appropriately managed.

(b)    Client shall be responsible to keep FGDI informed at all times of its anticipated requirements as soon as such requirements are known and shall, at a minimum, provide all available information respecting its corn inventories on hand at the Plant and actual and anticipated Plant corn usage rates. Client shall notify FGDI immediately of any disruptions or anticipated disruptions in the operation of the Plant. Upon receipt of any such notice FGDI shall undertake reasonable efforts to mitigate freight, demurrage and other expenses caused by Plant disruptions, but Client shall reimburse FGDI in full for all costs that cannot be avoided by reasonable efforts in mitigation.

(c)    FGDI shall be responsible for arranging logistics of corn origination, transportation and delivery. Such arrangements shall meet the Client's known

requirements for corn. FGDI shall pay freight costs, including advances as required by carriers, except rail car lease expense, which shall be paid by Client.

(d) Client shall be solely responsible for any risk management transactions with respect to its costs of corn, including, but not limited to, any cash forward contract program or hedging with respect to the costs of its corn requirements.

(e) Client shall be responsible for reporting to FGDI the quantity of grain unloaded on behalf of FGDI, and the origination source, by 9 am the following business day.

7. **Public Disclosure.** Any public announcements concerning the transaction(s) contemplated by this Agreement shall be approved in advance by all parties, except for disclosures required by law, in which case the disclosing party shall provide a copy of the disclosure to the other party prior to its public release. Financial details contained in this Agreement shall be deleted prior to any required public filing to the extent allowed by the law or regulations governing such filing.

8. **Licenses, Bonds, and Insurance.** Unless otherwise agreed by the parties in writing, Client and FGDI each agree to maintain in full force and effect during the term of this Agreement, each at its sole cost, all necessary state and federal licenses, bonds and insurance which are required for the conduct of their respective businesses in accordance with applicable state or federal laws and regulations.

9. **Limitation of Liability.** EACH PARTY UNDERSTANDS THAT NO PARTY MAKES ANY GUARANTEE, EXPRESS OR IMPLIED, TO ANY OTHER OF PROFIT, OR OF ANY PARTICULAR ECONOMIC RESULTS FROM TRANSACTIONS HEREUNDER. IN NO EVENT SHALL ANY PARTY BE LIABLE FOR SPECIAL, COLLATERAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES FOR ANY ACT OR OMISSION COMING WITHIN THE SCOPE OF THIS AGREEMENT, OR FOR BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SUCH EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF GOOD WILL, LOSS OF PROFITS, LOSS OF USE AND INTERRUPTION OF BUSINESS.

10. **Legal Disclaimer.** Each party understands that the other party makes no warranty respecting legal or regulatory requirements and risks. Each party shall obtain such legal and regulatory advice from third parties as it may deem necessary respecting the applicability of legal and regulatory requirements applicable to its own business.

11. **Indemnity and Attorney Fees.**

(a) Client agrees to indemnify FGDI and its officers, agents and employees and hold them harmless from and against any claims, demands, liability or expense, including attorney's fees and other litigation expenses, arising out of intentionally wrongful or negligent acts or omissions by Client or its agents, officers, directors and employees.

(b)    FGDI agrees to indemnify Client and its brokers, officers, agents and employees and hold them harmless from and against any claims, demands, liability or expense, including attorney's fees and other litigation expenses, arising out of intentionally wrongful or negligent acts or omissions by FGDI or its agents, officers, directors and employees.

(c)    The parties agree that the prevailing parties in any litigation or arbitration between the parties and related to this agreement shall be entitled to collect its costs, expenses, and reasonable attorney's fees from the other party.

12.    **Nature of Relationship.**  FGDI is an independent contractor providing services and corn origination to Client. No employment relationship, partnership or joint venture is intended, nor shall any such relationship be deemed created hereby. Each party shall be solely and exclusively responsible for its own expenses and costs of performance. This agreement is not intended to, and does not, create or give rise to any fiduciary duty on the part of any party to any other.

13.    **Notices.**  Any notices permitted or required hereunder shall be in writing, signed by an officer duly authorized of the party giving such notice, and shall either be hand delivered, sent by recognized overnight delivery service, or mailed to the designated representatives of the other parties. If mailed, notice shall be sent by certified, first class, return receipt requested, mail to the address shown above, or any other address subsequently specified by notice from one party to the other. All notices and other communications hereunder shall be deemed given upon the earlier of (i) delivery thereof if by hand, or (ii) upon receipt if sent by mail (registered or certified, postage prepaid, return receipt requested), or (iii) on the next business day after deposit if sent by a recognized overnight delivery service to the address shown above, or any other address subsequently specified by notice from one party to the others.

14.    **Books and Records.**  FGDI shall keep and maintain complete, accurate and detailed records of all transactions made under this Agreement and provide copies of such records to Client upon its request.

15.    **Term and Termination.**

(a)    The initial term of this Agreement and the obligations of the parties hereunder shall commence on the Effective Date (as hereinafter defined), and shall continue for a term of one year thereafter. Thereafter, the term of this Agreement shall be automatically extended for an unlimited number of successive one year terms on each anniversary date of the Effective Date, unless any party shall give written notice of non-renewal to the other parties not less than ninety (90) days prior to such anniversary date. For the purposes of this Agreement, "**Effective Date**" means August 1, 2008

(b)    The parties may extend or shorten the term of this Agreement at any time by modification agreement executed by both parties in writing.

7

(c)    (i) If Client shall be indebted to FGDI for Alternate Payment Corn by an amount in excess of the letter of credit described in Section 4(f) of this Agreement (the "Letter of Credit") or at any time fail to make any payment due under this Agreement (including but not limited to any delivery or contract for delivery of corn) by the Alternative Payment Date, then such failure shall constitute a default hereunder and if such default is not cured by the Client within one (1) business day of the occurrence of such default, then FGDI shall have the right to draw down the Letter of Credit in the amount of such default; and (ii) after any such draw, if Client shall be indebted to FGDI for Alternative Payment Corn by an amount in excess of the remaining amount of the Letter of Credit, or at any time fail to make any payment due under this Agreement by the Alternate Payment Date, then such failure shall constitute a default hereunder and if such default is not cured by the Client in one (1) business day of the occurrence of such default, then FGDI shall have the right to draw down the Letter of Credit in the amount of such default.

(d)    If Client shall at any time fail to make payment when due of any sum owing to FGDI under this Agreement, including but not limited to payment or for any delivery or contract for delivery of corn, then FGDI may suspend performance under this Agreement without terminating this Agreement, until payment in full of all sums due is made. If FGDI elects, it may also give notice of termination as provided in Section 15(e) for such cause.

(e)  *GAR*

(e)    This Agreement may be terminated by Client in the event of material breach of any of the material terms hereof by FGDI, by written notice specifying the breach, which notice shall be effective ninety (90) days after it is given unless the receiving party cures the breach within such time. This Agreement may be terminated by FGDI in the event of material breach of any of the material terms hereof by Client, by written notice specifying the breach, which notice shall be effective ninety (90) days after it is given unless the receiving party cures the breach within such time.

(f)    In the event any party (the "non-performing party") shall (i) file a petition or otherwise commence or authorize the commencement of a proceeding or case under any bankruptcy, reorganization, or similar law for the protection of creditors or have any such petition filed or proceeding commenced against it, (ii) otherwise become bankrupt or insolvent, (iii) be unable to pay its debts as they fall due, then any other party (the "performing party") shall have the right immediately and thereafter as long as the event of default continues to terminate this Agreement and any unperformed contracts, including, but not limited to, contracts for delivery of corn between the non-performing party and the performing party by notice in writing to the non-performing party. The performing party's rights under this provision shall be in addition to, and not in limitation or exclusion of, any other rights which the performing party may have (whether by agreement, operation of law or otherwise), including any right and

8

remedies under the Uniform Commercial Code. The non-performing party shall indemnify and hold the performing party and its affiliates harmless from all losses, damages, costs and expenses including reasonable attorney's fees, incurred in connection with an event of default, termination, or exercise of any remedies hereunder.

(g)    In addition to any other method of terminating this Agreement, any party may unilaterally terminate this Agreement at any time if such termination shall be required by any regulatory authority, and such termination shall be effective on the thirtieth (30th) day following the giving of notice of intent to terminate.

(h)    If Client terminates this Agreement for any cause other than (i) breach by FGDI as provided in Section 15(d) or (ii) under Section 15(e) where FGDI is the non-performing party, then at FGDI's option all open cash forward contracts shall either be fully performed notwithstanding such termination, or such forward contracts shall immediately be cash settled between the parties on terms consistent with NGFA Rules, which fully protect FGDI against loss thereon.

16.    **Financial Statements.** Client shall provide an audited financial statement to FGDI annually. All financial statements shall be provided promptly after prepared each year.

17.    **Amendment.** This Agreement may be amended, modified or supplemented only by prior mutual agreement, confirmed in writing and signed by the parties.

18.    **Force Majeure.** No party shall be liable for any failure or delay in performance of its obligations hereunder, other than a payment obligation, when such failure or delay is caused by or results from an event beyond its reasonable control, such as Acts of God or the public enemy, acts or demands of any government or governmental agency having jurisdiction, strikes, lockouts, labor disturbances, equipment malfunction or breakdown, fires, floods, accidents or other unforeseeable causes; provided, however, that during such period of time as a force majeure event is causing FGDI to fail or delay in the performance of its obligations hereunder, Client shall have the right to contract with other third parties to provide such services.

19.    **Waiver.** Any failure of FGDI or Client to comply with any obligation, covenant, agreement or condition contained herein may be waived in writing by FGDI or Client, as the case may be, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any other failure.

20.    **Confidentiality.**

(a)    As used in this Agreement, **"Confidential Information"** means any information, technical data or know-how (including, but not limited to, information relating to research, products, software, services, development, inventions, processes, engineering, marketing, techniques, customers, pricing, internal procedures, business and marketing plans or strategies, finances, employees and business

9

opportunities) disclosed by one party to the other in any form whatsoever (including, but not limited to, in writing, in machine readable or other tangible form, orally or visually): (i) that has been marked as confidential; (ii) the confidential nature of which has been made known by the disclosing party to the recipient, in writing or orally, and if orally, with specific written notification to the recipient of such oral disclosure within three days thereafter; or (iii) that due to its character, nature, or method of transmittal, a reasonable person under like circumstances would treat as confidential. The parties each agree to keep in confidence and prevent disclosure to any person outside its respective organization, or any person within its organization not having a reasonable need to know, all Confidential Information.

(b)  Information shall not be deemed to be Confidential Information to the extent that it is (i) in the public domain at the time of disclosure or is subsequently made available by the disclosing party to the general public without restriction; (ii) known to the receiving party at the time of disclosure without restrictions on its use or independently developed by the receiving party and there is adequate documentation to demonstrate either condition; or (iii) used or disclosed with the prior written approval of the disclosing party.

(c)  The receiving party may disclose the other party's Confidential Information pursuant to a statutory or regulatory requirement or a court order; provided, however, that (i) the receiving party will notify the other party of the obligation to make such disclosure in advance of the disclosure in order that the other party will have reasonable opportunity to object to such disclosure; and (ii) the receiving party requests confidential treatment of such disclosed Confidential Information.

(d)  The receiving party's obligations under this Agreement with respect to Confidential Information that it has received shall continue for a period of five years after the expiration or termination of this Agreement.

(e)  Nothing in this Agreement is intended to restrict or prevent Client from disclosing the terms hereof to credit analysts, rating agencies, bond insurers and prospective lenders and investors in connection with the financing or refinancing of the Plant.

21.  **Validity.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

22.  **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without regard to the conflicts-of-laws rules thereof.

23.     <u>Counterparts.</u>  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties and delivered to FGDI and Client.

24.     <u>Entire Agreement.</u>  This Agreement and any written customer account agreement between the parties embody the entire agreement and understanding of the parties in respect of the subject matter contained herein.  There are no other agreements, representations, warranties or covenants other than those expressly set forth, or referred to, herein.  This Agreement supersedes all prior agreements and understandings among the parties with respect to such subject matter.

25.     <u>Assignment.</u>  This Agreement shall be binding upon and inure to the benefit of the parties and the successors and assigns of the entire business and goodwill of FGDI or Client.  No party may assign this Agreement without the express consent of the other parties except that (i) no such consent shall be required in connection with a sale, merger or any acquisition of the entire business of any party; (ii) Client expressly consents that FGDI may assign to FCStone or Agrex, Inc or an affiliated company of FGStone or Agrex, Inc; and (iii) FGDI expressly consents that Client's rights and other interests hereunder may be pledged or assigned as security in connection with the financing or refinancing of the Plant to the extent the assignee agrees to the priority of FGDI's security for payment of corn as provided herein.

26.     <u>NGFA Trade Rules to Apply.</u>  Except as otherwise expressly provided herein, this Agreement and all contracts and confirmations for delivery of corn shall be subject to the Trade Rules of the National Grain and Feed Association.

27.     <u>Arbitration.</u>  The parties agree that the sole remedy for resolution of any and all other disagreements or disputes arising under this agreement including, but not limited to, any statutory or tort claims arising from the relationship of the parties, shall be through arbitration proceedings before the National Grain and Feed Association ("NGFA") under NGFA Arbitration Rules.  The decision and award determined through such arbitration shall be final and binding upon the parties thereto.  Judgment upon the arbitration award may be entered and enforced in any Court having jurisdiction thereof.  The parties agree that any arbitration conducted hereunder shall be governed by the Federal Arbitration Act, 9 United States Code §§ 1-16, as now existing or hereinafter amended.

28.     <u>Default.</u>  In the event of payment default by Client, FGDI will allow one business day for Client to remedy prior to collection under the Letter of Credit.  FGDI retains all legal rights and remedies including the right to immediately suspend shipments.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first written above.

11

FGDI, L.L.C.

By: _____

Title: _Ex VP_____

GOE-Lima, L.L.C.

By: _____

Title: _PRESIDENT_____

## EXHIBIT A

CORN ORIGINATION SERVICES

FGDI shall sell and deliver to Client the minimum Purchase Amount described in section 3 of this Agreement. In connection with such origination services, FGDI shall:

- Forward Contract when appropriate.
- Assure proper corn volume and delivery timing.
- Administer and settle corn contracts per NGFA Corn Trade Rules.
- Pass through all grade and dead freight discounts to Client.

OPERATIONS SUPPORT

FGDI also shall provide transportation and rail management services to Client.  Operations services shall also include, but not be limited to:

- Inbound corn scheduling and logistics.
- Rail contract negotiation service.
- Rail carrier management services.
- Upon Client's request, file for railroad rebates on Client's behalf.
- Provide current information on rail rates and spreads.
- Pay rail freight in accordance with rail rate requirements.

**EXHIBIT B-1**

LETTER OF AUTHORIZATION

TO:    FGDI, L.L.C.  ("FGDI")
         P.O. Box 149
         19901 North Dixie Highway, Suite B
         Bowling Green, Ohio 43402

Each of the following individuals is authorized to give oral or written instructions to FGDI, or its affiliates on behalf of the Client with respect to any transactions or matters within the scope of the GRAIN ORIGINATION AGREEMENT among Client and FGDI, LLC and each is also fully authorized to do and take all actions necessary or desirable in connection with any such transactions or matters. The authorized individuals are (must name at least one person):

Steve Patton

Gregory Kruger

_____

We further verify that we shall notify FGDI in writing whenever the above named individual(s) are no longer authorized to give oral or written instructions to FGDI on behalf of the Client, and we shall notify FGDI of any newly-authorized staff members whenever applicable.

Dated this _____ day of _____, 20__.


_____
(Print Client Name)

By: _____
(Authorized Signatory)

Title: _____

14

### EXHIBIT B-2

### LETTER OF AUTHORIZATION

To Client: GOE-Lima LLC

Each of the following individuals is authorized to give oral or written instructions to Client or its affiliates on behalf of FGDI, L.L.C. with respect to any transactions or matters within the scope of the GRAIN ORIGINATION AGREEMENT among Client and FGDI, L.L.C. and each is also fully authorized to do and take all actions necessary or desirable in connection with any such transactions or matters. The authorized individuals are (must name at least one person):

Robert Obrock

Roger Buzard

Steve Spieth

Katie Hartman

Mark Patton

We further verify that we shall notify Client in writing whenever the above named individual(s) are no longer authorized to give oral or written instructions to Client on behalf of FGDI, L.L.C. and we shall notify Client of any newly-authorized staff members whenever applicable.

Dated this 29 day of July, 2008

FGDI, L.L.C.

By: _Robert Obrock_____
(Authorized Signatory)

Title: EVP/VP_____

15

16

**EXHIBIT B**

Silicon Valley Bank )
A Member of SVB Financial Group

IRREVOCABLE STANDBY LETTER OF CREDIT NO. SVBSF005418

DATE: JULY 29, 2008

BENEFICIARY:
FGDI, LLC
19901 N. DIXIE HIGHWAY, SUITE B
P.O.BOX 149
BOWLING GREEN, OH 43402

APPLICANT:
PALADIN HOMELAND SECURITY HOLDINGS, LLC
300 DELAWARE AVENUE, SUITE 1290
WILMINGTON, DE 19801

AMOUNT: US$2,000,000.00(U.S.DOLLARS TWO MILLION EXACTLY)

EXPIRATION DATE:  JANUARY 31, 2009

LOCATION: SANTA CLARA, CALIFORNIA

DEAR SIR/MADAM:
WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO.005418 IN YOUR FAVOR,
FOR THE ACCOUNT OF PALADIN HOMELAND SECURITY HOLDINGS, LLC ("THE APPLICANT").  WE
HEREBY IRREVOCABLY AUTHORIZE THE BENEFICIARY (THE "DRAWING BENEFICIARY") TO DRAW ON US
UP TO AN AGGREGATE AMOUNT OF TWO MILLION U.S. DOLLARS (US$2,000,000.00) AS REDUCED FROM
TIME TO TIME AS SET FORTH IN THIS LETTER OF CREDIT,(THE "STATED AMOUNT") AVAILABLE
AGAINST PRESENTATION OF THE DATE DRAWING REQUEST ON US, MANUALLY SIGNED BY A
PROPORTEDLY AUTHORIZED  OFFICER OF DRAWING BENEFICIARY (WHO IS IDENTIFIED AS SUCH
OFFICER) APPROPRIATELY COMPLETED IN THE FORM OF ANNEX 1  HERETO (THE "DRAWING
REQUEST"), AND ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1. THE ORIGINAL OF THIS LETTER OF CREDIT AND ALL AMENDMENT(S), IF ANY.
2. YOUR SIGHT DRAFT DRAWN ON US IN THE FORM OF EXHIBIT A HERETO.
3. A SIGNED AND DATED CERTIFICATE FROM THE BENEFICIARY IN THE FORM OF ANNEX 1.
4. COPY(IES) OF THE INVOICE(S) MARKED "UNPAID".

CONTENTS OF SAID COPY(IES) OF "UNPAID" INVOICE(S) WILL NOT BE EXAMINED BY SILICON
VALLEY BANK FOR ITS DATA CONTENT EXCEPT FOR NAME OF BENEFICIARY AND APPLICANT.

ALL COMMUNICATIONS WITH RESPECT TO THIS LETTER OF CREDIT SHALL BE IN WRITING, ADDRESSED
TO US ON A BUSINESS DAY AT OUR OFFICE (THE "BANK'S OFFICE") AT: SILICON VALLEY BANK,
3003 TASMAN DRIVE, SANTA CLARA, CA 95054, ATTENTION:  STANDBY LETTER OF CREDIT
NEGOTIATION SECTION BY OVERNIGHT COURIER SERVICE OR BY FACSIMILE TRANSMISSION AT: (408)
654-6211 OR (408) 496-2418, REFERENCING THIS LETTER OF CREDIT NO.SVBSF005418.

ALL DEMANDS FOR PAYMENT SHALL BE MADE BY PRESENTATION OF THE ORIGINAL APPROPRIATE
DOCUMENTS TO US BY OVERNIGHT DELIVERY SERVICE ON A BUSINESS DAY AT OUR OFFICE (THE
"BANK'S OFFICE") AT: SILICON VALLEY BANK, 3003 TASMAN DRIVE, SANTA CLARA, CA 95054,
ATTENTION: STANDBY LETTER OF CREDIT NEGOTIATION SECTION OR BY FACSIMILE TRANSMISSION
AT: (408) 654-6211 OR (408) 496-2418; AND SIMULTANEOUSLY UNDER TELEPHONE ADVICE TO:
(408) 654-7120 OR (408) 654-6349, ATTENTION: STANDBY LETTER OF CREDIT NEGOTIATION
SECTION WITH ORIGINALS TO FOLLOW BY OVERNIGHT COURIER SERVICE; PROVIDED, HOWEVER, THE
BANK WILL DETERMINE HONOR OR DISHONOR ON THE BASIS OF PRESENTATION BY FACSIMILE ALONE,
AND WILL NOT EXAMINE THE ORIGINALS.

-1-

3003 Tasman Drive  Santa Clara, California 95054
PHONE 408.654.7400  svb.com

## Silicon Valley Bank ⟩
A Member of SVB Financial Group

IRREVOCABLE STANDBY LETTER OF CREDIT NO.SVBSF005418

IF THE DRAWING REQUEST IS PRESENTED TO US PRIOR TO EXPIRATION OR TERMINATION OF THIS LETTER OF CREDIT IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT BY 9:00 A.M., CALIFORNIA TIME, ON A BUSINESS DAY, PAYMENT WILL BE MADE NO LATER THAN 2:00 P.M. CALIFORNIA TIME ON THE FOLLOWING BUSINESS DAY. PAYMENT UNDER THIS LETTER OF CREDIT SHALL BE MADE IN IMMEDIATELY AVAILABLE FUNDS BY WIRE TRANSFER TO THE ACCOUNT OF THE DRAWING BENEFICIARY SET FORTH IN THE DRAWING REQUEST.

AS USED IN THIS LETTER OF CREDIT, "BUSINESS DAY" MEANS ANY DAY ON WHICH COMMERCIAL BANKS LOCATED IN SANTA CLARA, CALIFORNIA ARE NOT REQUIRED OR AUTHORIZED BY LAW TO REMAIN CLOSED.

THIS LETTER OF CREDIT SHALL EXPIRE ON THE EXPIRATION DATE STATED ABOVE, AS THE SAME MAY BE EXTENDED (THE "EXPIRATION DATE"). THIS LETTER OF CREDIT IS EFFECTIVE IMMEDIATELY.

IN THE EVENT THAT A DRAWING REQUEST FAILS TO COMPLY WITH THE TERMS OF THIS LETTER OF CREDIT, WE SHALL WITHIN TWO (2) BUSINESS DAYS PROVIDE THE DRAWING BENEFICIARY NOTICE BY TELEPHONE OR FACSIMILE FOLLOWED BY WRITTEN CONFIRMATION VIA MAIL OF SAME STATING THE REASONS THEREFORE AND SHALL UPON YOUR INSTRUCTIONS HOLD ANY NON-CONFORMING DRAWING REQUEST AT YOUR DISPOSAL OR RETURN ANY NONCONFORMING DRAWING REQUEST TO THE DRAWING BENEFICIARY AT THE ADDRESS SET FORTH ABOVE BY OVERNIGHT COURIER OR FACSIMILE TRANSMITTAL. UPON BEING NOTIFIED THAT THE DRAWING WAS NOT EFFECTED IN COMPLIANCE WITH THIS LETTER OF CREDIT, THE DRAWING BENEFICIARY MAY, ON OR PRIOR TO THE EXPIRATION DATE, AS APPLICABLE, ATTEMPT TO CORRECT SUCH NON-COMPLYING DRAWING REQUEST IN ACCORDANCE WITH THE TERMS OF THIS LETTER OF CREDIT.

THIS LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING AND THIS UNDERTAKING SHALL NOT IN ANY WAY BY MODIFIED, AMENDED, LIMITED OR AMPLIFIED BY REFERENCE TO ANY DOCUMENT, INSTRUMENT OR AGREEMENT REFERRED TO HEREIN, EXCEPT ONLY DEFINED TERMS USED HEREIN AND THE DRAWING REQUESTS AND CERTIFICATES REFERRED TO HEREIN; AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE HEREIN BY REFERENCE ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXCEPT FOR SUCH DEFINED TERMS, DRAWING REQUESTS AND CERTIFICATES.

PARTIAL DRAWINGS UNDER THIS LETTER OF CREDIT ARE ALLOWED AND EACH SUCH PARTIAL DRAWING SHALL REDUCE THE AMOUNT THEREAFTER AVAILABLE HEREUNDER FOR DRAWINGS UNDER THIS LETTER OF CREDIT. THE STATED AMOUNT OF THIS LETTER OF CREDIT SHALL BE REDUCED AUTOMATICALLY BY THE AMOUNT OF EACH DRAWING HONORED BY US HEREUNDER.

THIS LETTER OF CREDIT MUST ACCOMPANY ANY DRAWINGS HEREUNDER FOR ENDORSEMENT OF THE DRAWING AMOUNT AND WILL BE RETURNED TO THE DRAWING BENEFICIARY UNLESS IT IS FULLY UTILIZED.

ALL BANKING CHARGES INCLUDING SILICON VALLEY BANK'S ISSUANCE FEES, AND OTHER APPLICABLE FEES AND CHARGES ARE FOR THE ACCOUNT OF APPLICANT.

WE HEREBY ENGAGE WITH YOU THAT A DRAWING REQUEST DRAWN STRICTLY IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT AND AMENDMENTS THERETO SHALL MEET WITH DUE HONOR UPON PRESENTATION.

IF ANY INSTRUCTIONS ACCOMPANYING A DRAWING UNDER THIS LETTER OF CREDIT REQUEST THAT PAYMENT IS TO BE MADE BY TRANSFER TO THE BENEFICIARY'S ACCOUNT WITH ANOTHER BANK, WE WILL ONLY EFFECT SUCH PAYMENT BY FED WIRE TO A U.S. REGULATED BANK, AND WE AND/OR SUCH OTHER BANK MAY RELY ON AN ACCOUNT NUMBER SPECIFIED IN SUCH INSTRUCTIONS EVEN IF THE NUMBER IDENTIFIES A PERSON OR ENTITY DIFFERENT FROM THE INTENDED PAYEE.

EXCEPT AS FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS STANDBY LETTER OF CREDIT IS

Silicon Valley Bank )
A Member of SVB Financial Group

IRREVOCABLE STANDBY LETTER OF CREDIT NO.SVBSF005418

SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES ("ISP98"), INTERNATIONAL CHAMBER OF
COMMERCE PUBLICATION NO. 590, AND AS TO MATTERS NOT GOVERNED BY THE ISP98, SHALL BE
GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA AND
APPLICABLE U.S. FEDERAL LAW.

SILICON VALLEY BANK,

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

Linda Wu

PAGE 3

3003 Tasman Drive  Santa Clara, California 95054
PHONE 408.654.7400  svb.com

ANNEX 1
TO SILICON VALLEY BANK LETTER OF CREDIT NO. _____

DRAWING REQUEST

[DATE]

"DRAWN UNDER [ISSUING BANK] LETTER OF CREDIT NO. [_____] IRREVOCABLE STANDBY LETTER OF CREDIT DATED _____, 2008."

SILICON VALLEY BANK
3003 TASMAN DRIVE
SANTA CLARA, CA 95054
ATTENTION: STANDBY LETTER OF CREDIT NEGOTIATION SECTION

LADIES AND GENTLEMEN:
THE UNDERSIGNED HEREBY DRAWS ON SILICON VALLEY BANK LETTER OF CREDIT NO. _____ IRREVOCABLE STANDBY LETTER OF CREDIT (THE "LETTER OF CREDIT"), DATED JULY ___ 2008, ISSUED BY YOU IN FAVOR OF US. I AM AN AUTHORIZED OFFICER OF THE BENEFICIARY OF THE LETTER OF CREDIT. ANY CAPITALIZED TERM USED HEREIN AND NOT DEFINED HEREIN SHALL HAVE ITS RESPECTIVE MEANING AS SET FORTH IN THE LETTER OF CREDIT.

IN CONNECTION WITH THIS DRAWING, I HEREBY CERTIFY THAT:
(A) THIS DRAWING IN THE AMOUNT OF US$_____ IS BEING MADE PURSUANT TO SILICON VALLEY BANK OF CREDIT NO._____ IRREVOCABLE STANDBY LETTER OF CREDIT ISSUED TO FGDI, LLC IN ACCORDANCE WITH THAT CERTAIN GRAIN ORIGINATION AGREEMENT, DATED AS OF JULY ___, 2008 BETWEEN GOE LIMA, LLC AND FGDI, LLC.
(B) THE CONDITIONS SET FORTH IN SECTION 15(C) OF THE GRAIN ORIGINATION AGREEMENT HAVE OCCURRED AND GOE LIMA IS IN DEFAULT AND THE GRACE PERIOD HAS EXPIRED.
(C) UNDER THE TERMS OF THE GRAIN ORIGINATION AGREEMENT, THE UNDERSIGNED BENEFICIARY IS ENTITLED TO MAKE THIS DRAWING AND APPLY THE PROCEEDS OF SUCH DRAWING TO THE CORN PAYMENTS (AS DEFINED IN THE GRAIN ORIGINATION AGREEMENT); AND
(D) THE AMOUNT REQUESTED TO BE DRAWN DOES NOT EXCEED THE STATED AMOUNT.

YOU ARE DIRECTED TO MAKE PAYMENT OF THE REQUESTED DRAWING TO OUR ABA NUMBER _____ WITH THE FEDERAL RESERVE BANK.

IN WITNESS WHEREOF, THE UNDERSIGNED HAS EXECUTED AND DELIVERED THIS REQUEST ON THIS _____ DAY OF _____,200_.

FGDI, LLC
AS BENEFICIARY

BY:_____
NAME:
TITLE:

EXHIBIT "A"

DATE: _____

REF. NO. _____

AT SIGHT OF THIS DRAFT

PAY TO THE ORDER OF _____ US$ _____

USDOLLARS _____

_____

DRAWN UNDER SILICON VALLEY BANK, SANTA CLARA, CALIFORNIA, STANDBY
LETTER OF CREDIT NUMBER NO. _____ DATED _____

TO: SILICON VALLEY BANK
    3003 TASMAN DRIVE
    SANTA CLARA, CA 95054
                              _____
                              (BENEFICIARY'S NAME)

                              ..............................................
                              Authorized Signature

## GUIDELINES TO PREPARE THE DRAFT

1. DATE: ISSUANCE DATE OF DRAFT.
2. REF. NO.: BENEFICIARY'S REFERENCE NUMBER, IF ANY.
3. PAY TO THE ORDER OF: NAME OF BENEFICIARY AS INDICATED IN THE L/C (MAKE SURE BENEFICIARY ENDORSES IT ON THE REVERSE SIDE).
4. US$: AMOUNT OF DRAWING IN FIGURES.
5. USDOLLARS: AMOUNT OF DRAWING IN WORDS.
6. LETTER OF CREDIT NUMBER: SILICON VALLEY BANK'S STANDBY L/C NUMBER THAT PERTAINS TO THE DRAWING.
7. DATED: ISSUANCE DATE OF THE STANDBY L/C.
8. BENEFICIARY'S NAME: NAME OF BENEFICIARY AS INDICATED IN THE L/C.
9. AUTHORIZED SIGNATURE: SIGNED BY AN AUTHORIZED SIGNER OF BENEFICIARY.

IF YOU NEED FURTHER ASSISTANCE IN COMPLETING THIS DRAFT, PLEASE CALL OUR L/C PAYMENT
SECTION AND ASK FOR:

ALICE DA LUZ: 408-654-7120
EFRAIN TUVILLA: 408-654-6349

## AGREEMENT FOR ASSIGNMENT OF CLAIMS AND PROCEEDS UNDER
## LETTER OF CREDIT

**THIS AGREEMENT FOR ASSIGNMENT OF CLAIMS AND PROCEEDS UNDER LETTER OF CREDIT** ("Agreement") is made as of October __, 2008, by and among **FGDI, LLC,** a Delaware limited liability company (hereinafter referred to as "Assignor"), **SUNTRUST BANK,** a Georgia banking corporation, (hereinafter referred to as "Assignee") in its capacity as agent for each of the lenders signatory hereto (the "DIP Lenders") and each of the DIP Lenders. All capitalized, undefined terms used herein shall have the same meanings as used in that certain Standby Letter of Credit Agreement and Application, between GOE Lima, LLC ("GOE") and Assignee (the "Reimbursement Agreement") and that certain Irrevocable Letter of Credit No. F 95313, dated as of October 28, 2008, issued by Assignee in favor of Assignor (the "Letter of Credit").

## W I T N E S S E T H:

**WHEREAS,** Assignor is a party to that certain Grain Origination Agreement, dated as of July 29, 2008, between Assignor and GOE (the "Grain Contract");

**WHEREAS,** Assignor is the beneficiary under that certain Irrevocable Standby Letter of Credit No. SVBSF005418 in the original face amount of $2,000,000 (the "SVB Letter of Credit") issued by Silicon Valley Bank as issuer (the "SVB"); which SVB Letter of Credit was issued as additional security for the obligations of GOE under the Grain Contract;

**WHEREAS,** GOE filed for protection under Chapter 11 of the United States Bankruptcy Code  in the United States Bankruptcy Court for the Northern District of Ohio, Toledo Division, on or about October 14, 2008;

**WHEREAS,** Assignor has continued to make deliveries to GOE subsequent to the filing of the GOE bankruptcy proceeding (the "Past Post-Petition Deliveries"), after receiving deposits from GOE in connection with such deliveries in the approximate amount of $800,000.00 (the "Deposits");

**WHEREAS,** GOE wishes Assignor to (i) return the Deposits to GOE; (ii) make draws on the SVB Letter of Credit for payment of the Past Post-Petition Deliveries; and (iii) make draws on the SVB Letter of Credit for all future deliveries made by Assignor to GOE during the pendency of its bankruptcy case (the "Future Post-Petition Deliveries"), which actions shall hereinafter be referred to as the "Requested Activity;"

**WHEREAS,** as an inducement for Assignor to engaged in the Requested Activity, Assignee has agreed to issue the Letter of Credit for the benefit of the Assignor as additional security and to backstop the SVB Letter of Credit pursuant to the terms of that certain Line of

Credit Note, dated as of October 17, 2008, among GOE, the DIP Lenders and Assignee as agent to the Lenders (as amended from time to time, the "Line of Credit Note");

**WHEREAS**, as an additional inducement for Assignor to engage in the Requested Activity, the DIP Lenders have agreed to indemnify Assignor from loss or liability in connection with the Requested Activity, subject to the terms and conditions set forth herein; and

**WHEREAS**, in consideration thereof, Assignor has agreed to assign to Assignee all of its right, title and interest in and to the Assigned Interests (as defined below).

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS CONTAINED HEREIN, IT IS ACCORDINGLY AGREED AS FOLLOWS:

Section 1.     Assignor hereby grants, transfers and assigns to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to (i) any claims or causes of action held by Assignor against SVB for the payment of all sums now or at any time hereafter due to Assignor under the SVB Letter of Credit, and (ii) all proceeds and other letter of credit rights of the Assignor under the SVB Letter of Credit (collectively, the "Assigned Interests"). Notwithstanding anything to the contrary, nothing herein shall be deemed to assign Assignor's right to draw on the SVB Letter of Credit and receive the proceeds of such draw.

Section 2.     Assignor represents and warrants that:

(a)     There is no assignment of any Assignor's rights under any of the Assigned Interest to any other person.

(b)     Assignor has full right, power and authority to assign its rights in the Assigned Interests without the consent of any party thereto or any other person.

(c)     Assignor has not done or omitted to do any act so as to be estopped from exercising any of its rights under any of the Assigned Interests.

(d)     Assignor is not prohibited under any agreement with any other person or under any judgment or decree from the execution and delivery of this assignment or the performance of each and every covenant of Assignor hereunder or in the Assigned Interests.

Section 2.     Assignor agrees and covenants unto Assignee as follows:

(a)     Assignor will (i) fulfill, perform and observe each and every condition and covenant of Assignor contained in SVB Letter of Credit; and (ii) give prompt notice to Assignee of any claim of default or dishonor under the SVB Letter of Credit given to Assignor, together with a complete copy or statement of any information submitted or referenced in support of such claim.

2

(b)      Assignor will not, without Assignee's prior consent, (i) materially modify the terms of the SVB Letter of Credit or (ii) waive, or release any person from the observance or performance of any obligation to be performed under the terms of the SVB Letter of Credit or liability on account of any warranty given by them.

(c)      The rights assigned hereunder include all of Assignor's right and title (i) to modify the SVB Letter of Credit; and (ii) and to waive, or release the performance or observance of any obligation or condition of the SVB Letter of Credit.

Section 3.      Should Assignor fail to perform or observe any covenant or comply with any condition contained in any of the Assigned Interests, then Assignee, but without obligation to do so, without notice to or demand on Assignor, and without releasing Assignor from its obligations to do so, may perform such covenant or condition.  Assignee shall provide notice to the Assignor of any action taken with respect to this Section 3 prior to taking such action; provided however, (1) neither the failure to give such notice, nor any defect in such notice shall affect the validity of any such action taken by the Assignee and (2) Assignee shall have no liability whatsoever for failure to provide such notice or any defect in such notice.

Section 4.      Assignor hereby irrevocably constitutes and appoints Assignee (and all officers, employees or agents designated by Assignee), with full power of substitution, as Assignor's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Assignor and in the name of Assignor or in its own name, from time to time in Assignee's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement and the SVB Letter of Credit and, without limiting the generality of the foregoing, Assignor hereby grants to Assignee the power and right, on behalf of Assignor, without notice to or assent by Assignor, and at any time, to do the following: (a) defend any suit, action or proceeding brought against Assignor in connection with the SVB Letter of Credit; (b) file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by Assignee for the purpose of collecting any and all such moneys due to Assignor under the SVB Letter of Credit whenever payable and to enforce any other right in respect of Assignor's rights under the SVB Letter of Credit; and (c) communicate in its own name with any party to the SVB Letter of Credit with regard to the assignment of the right, title and interest of Assignor in and under the SVB Letter of Credit and other matters relating thereto.  Assignor hereby ratifies, to the extent permitted by law, all that said Assignee shall lawfully do or cause to be done by virtue hereof. No person to whom this Agreement is presented, as authority for Assignee to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from Assignor as to the authority of Assignee to take any action described below, or as to the existence of or fulfillment of any condition to this Agreement, which is intended to grant to Assignee unconditionally the authority to take and perform the actions contemplated herein, and Assignor irrevocable waives any right to commence any suit or action, in law or equity, against any person or entity which acts in reliance upon or acknowledges the authority granted under this Power of Assignee.  The power of attorney granted hereby is coupled with an interest, and may not be revoked or canceled by Assignor without Assignee's written consent.

3

Section 5.     The remedies herein provided shall be in addition to and not in substitution for the rights and remedies which would otherwise be vested in Assignee in any of the Security Instruments or in law or in equity, all of which rights and remedies are specifically reserved by Assignee. The remedies herein provided or otherwise available to Assignee shall be cumulative and may be exercised concurrently. The failure to exercise any of the remedies herein provided shall not constitute a waiver thereof, nor shall the use of any of the remedies hereby provided prevent the subsequent or concurrent resort to any other remedy or remedies. It is intended that this clause shall be broadly construed so that all remedies herein provided for or otherwise available to Assignee until all sums due it by reason of this Agreement have been paid to it in full and all obligations incurred by it in connection with the construction or operation of the contemplated improvements on the premises have been fully discharged without loss or damage to Assignee.

Section 6.     Each of the DIP Lenders, jointly in proportion to their pro rata share of the Commitments (as defined in the Line of Credit Note) under the Line of Credit Note shall indemnify the Assignor against any losses, liabilities, claims, and damages (collectively, "Losses") incurred by Assignor and its officers, employees and agents in connection with any claim, suit, action or proceeding asserted by SVB or by Paladin Homeland Securities Holdings, L.L.C. against Assignor and its officers, employees and agents arising out of, in connection with or as a result of any honored draw under the SVB Letter of Credit where Assignor complied with each of the conditions set forth on Exhibit A hereto when such draw was made (an "Honored Draw") and which SVB subsequently claims should not have been honored; provided, that the DIP Lenders shall not be obligated to indemnify the Assignor for any legal costs or expenses incurred in connection with the foregoing, including without limitation, fees and disbursements of any counsel for the Assignor if the Assignee has assumed the defense of such claim, suit, action or proceeding, and if the DIP Lenders have refunded the amount of the Honored Draw that is the subject of such claim, suit, action or proceeding; provided, further, that the DIP Lenders shall not be obligated to indemnify the Assignor for any of the foregoing Losses arising out of (x) Assignor's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment or (y) the failure by Assignor to comply with the terms of the following two sentences of this Section 6. Immediately upon knowledge of any claim, suit, action or proceeding made by SVB or by Paladin Homeland Securities Holdings, L.L.C. against Assignor, Assignor shall provide notice to Assignee thereof and hereby consents that Assignee shall have the sole right to defend any such claim, suit, action or proceeding with all of the powers granted to Assignee pursuant to Section 4 above. Assignor agrees to cooperate with Assignee in the defense of such claims, suits, actions or proceedings, including executing any additional documents necessary to allow Assignee to conduct such defense. Notwithstanding any other provision of this Agreement to the contrary, the DIP Lenders agree that the mere fact that draws are made by Assignor on the SVB Letter of Credit with respect to Past Post-Petition Deliveries and Future Post-Petition Deliveries shall not under any circumstance entitle the DIP Lenders to claim that such draws constitute gross negligence or willful misconduct on Assignor's part.

Section 7.     This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

4

Section 8.      This Agreement may be executed by one or more of the parties hereto in any number of separate counterparts, each of which shall be deemed an original and all of which, taken together, shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile transmission or by electronic mail in PDF form shall be as effective as delivery of a manually executed counterpart hereof.

Section 9.      This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors, successors-in-titles, and assigns.

Section 10.      This Agreement sets forth the entire understanding of the parties with respect to the matters set forth herein, and shall supersede any prior negotiations or agreements, whether written or oral, with respect thereto.

[Remainder of page intentionally left blank]

5

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be executed by its authorized officers and its seal affixed, all as of the day and year first above written.

<u>ASSIGNOR</u>:

**FGDI, LLC,** a Delaware limited liability company

By: _____
     Name:
     Title:

<u>ASSIGNEE AND DIP LENDERS</u>:

**SUNTRUST BANK,** a Georgia banking corporation, as Assignee and as a DIP Lender

By: _____
Name:  Janet R. Naifeh
Title:  SVP

**FARM CREDIT BANK OF TEXAS**

By: _____
Name:
Title:

**ING USA ANNUITY AND LIFE INSURANCE COMPANY**

By:  ING Investment Management LLC, as Agent

By: _____
Name:
Title:

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be executed by its authorized officers and its seal affixed, all as of the day and year first above written.

ASSIGNOR:

**FGDI, LLC,** a Delaware limited liability company

By: _____
     Name:
     Title:

ASSIGNEE AND DIP LENDERS:

**SUNTRUST BANK,** a Georgia banking corporation, as Assignee and as a DIP Lender

By_____
     Name:
     Title:

**FARM CREDIT BANK OF TEXAS**

By: _____
Name:  Alan Robinson
Title:   Vice President

**ING USA ANNUITY AND LIFE INSURANCE COMPANY**

By:  ING Investment Management LLC, as Agent

By: _____
Name:
Title:

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be executed by its authorized officers and its seal affixed, all as of the day and year first above written.

ASSIGNOR:

**FGDI, LLC,** a Delaware limited liability company

By: _____
    Name:
    Title:

ASSIGNEE AND DIP LENDERS:

**SUNTRUST BANK,** a Georgia banking corporation, as Assignee and as a DIP Lender

By_____
    Name:
    Title:

**FARM CREDIT BANK OF TEXAS**

By: _____
Name:
Title:

**ING USA ANNUITY AND LIFE INSURANCE COMPANY**

By: ING Investment Management LLC, as Agent

By: _____
Name: Christopher P. Lyons
Title: Senior Vice President

**ING LIFE INSURANCE AND ANNUITY COMPANY,**

By: ING Investment Management LLC, as Agent

By: _____
Name:  Christopher P. Lyons
Title:   Senior Vice President

**MASS MUTUAL LIFE INSURANCE COMPANY**

By:  Babson Capital Management LLC, as Investment Advisor

By: _____
Name:
Title:

**BABSON MID-MARKET CLO, LTD. 2007-II**

By: Babson Capital Management LLC as Collateral Manager

By: _____
Name:
Title:

**ING LIFE INSURANCE AND ANNUITY COMPANY,**

By: ING Investment Management LLC, as Agent

By: _____
Name:
Title:

**MASS MUTUAL LIFE INSURANCE COMPANY**

By: Babson Capital Management LLC, as Investment Advisor

By: _____
Name: Art McMahon
Title: Director

**BABSON MID-MARKET CLO, LTD. 2007-II**

By: Babson Capital Management LLC as Collateral Manager

By: _____
Name: Art McMahon
Title: Director

**ALLIED IRISH BANKS, P.L.C.**

By:
Name:    Robert F. Moyle
Title:    Senior Vice President

By:
Name:    Aidan Lanigan
Title:    Vice President

**ERSTE GROUP BANK AG**

By:
Name:
Title:

By:
Name:
Title:

**ALLIED IRISH BANKS, P.L.C.**

By: _____
Name:
Title:


By: _____
Name:
Title:

**ERSTE GROUP BANK AG**

By: _____
Name: Robert Suehnholz
Title:   Executive Director


By: _____
Name: Patrick W. Kunkel
Title:   Director

Exhibit A
Draw Conditions

(1) The draw request under the SVB Letter of Credit was submitted prior to the Expiration Date (as defined in the SVB Letter of Credit).

(2) Such draw request was manually signed by an authorized officer of Beneficiary (who was identified as such officer) and was appropriately completed in the form of Annex 1 to the SVB Letter of Credit.

(3) Such draw request was accompanied by the following documents (the draw request along with the documents set forth below being the "Required Draw Documents"):

    (a) The original SVB Letter of Credit and all amendments, if any;
    (b) A duly executed sight draft in the form of Exhibit A to the SVB Letter of Credit;
    (c) A signed and dated certificate from the Beneficiary in the form of Annex 1 to the SVB Letter of Credit; and
    (d) Copies of the Invoices marked "Unpaid."

(4) The Required Draw Documents were made by presentation by overnight delivery service on a business day at Silicon Valley Bank, 3003 Tasman Drive, Santa Clara, CA 95054, Attention Standby Letter of Credit Negotiation Section or by facsimile transmission at: 408-654-6211 or 408-496-2418; and simultaneously under telephone advice to 408-654-7120 or 408-654-6349, with originals to follow by overnight courier service.

STATE OF _OHIO_

COUNTY OF _WOOD_

On this _28th_ day of October, 2008, _JEAN BRATTON_ who is personally known to me appeared before me in his/her capacity as the _VP & CFO_ of FGDI, LLC ("Assignor") and executed on behalf of Assignor the Agreement to which this Certificate is attached.

{Notary Seal must be affixed}

_Donald Eugene Finn_
Signature of Notary

_DONALD EUGENE FINN_
Name of Notary (Typed, Printed or Stamped)

My Commission Expires (if not legible on seal): _5/22/2013_

9

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be executed by its authorized officers and its seal affixed, all as of the day and year first above written.

ASSIGNOR:

**FGDI, LLC,** a Delaware limited liability company

By _Jean Bratton_

Name: Jean Bratton

Title: VP & CFO — FGDI, LLC

ASSIGNEE AND DIP LENDERS:

**SUNTRUST BANK,** a Georgia banking corporation, as Assignee and as a DIP Lender

By_____

Name:

Title:

**FARM CREDIT BANK OF TEXAS**

By: _____

Name:

Title:

**ING USA ANNUITY AND LIFE INSURANCE COMPANY**

By:  ING Investment Management LLC, as Agent

By: _____

Name:

Title: